The Honorable, the judges of the United States Court of Appeals for the Eighth Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this Honorable Court may now draw near and they will be heard. God save the United States and this Honorable Court. Good morning, everyone. Welcome to the United States Court of Appeals for the Eighth Circuit. We have a fairly full docket this morning, so we'll get right to work. Madam Clerk, would you call the first case? Case number 21-2292 from the Western District of Missouri, Anna St. John v. Lisa Jones. All right. Mr. Frank for the appellate. You're muted, Mr. Frank. Thank you, Your Honor. May it please the Court. Ted Frank for appellant, Anna St. John. $16 million to SIPRE, more than 97% of the class with no cash. Bank America creates a bright line rule that forbids the SIPRE distribution here. A SIPRE distribution to a third party of unclaimed settlement funds is permissible only when it is not feasible to make further distributions to a third party. There's an except on your sentence, right? Yes, Your Honor. Except where? Okay. Tell me why you don't follow the except clause. Certainly. Refusing more distributions because they're costly and difficult, as what happens in Bank of America, is reversible error, and that's the same error the Court made here. I know, counsel. I was referring to when additional distribution would provide a windfall to class members. What about that? Yes. Well, Bank of America controls there. The under 3% of the class who are claimants are not fully compensated as a matter of law. The District Court committed reversible error in holding that Bank of America. The case about unliquidated damages did not apply here because the damages were unliquidated. As in Bank of America, it's the allegations of the complaint that control whether a compromise fully compensates class members rather than an adjudication of the strength of those claims. Mr. Frank, I have a question about that aspect of your argument. Are you asserting that whatever is alleged as the damage in the complaint, and I think you have some so long as it's, I don't know, feasible or something like that, that that rules and that there's no role for the District Court to assess the value of the claim as the Court did here? That's correct, and that was exactly what happened in Bank of America. The dissent in Bank of America, as you might recall, argued that the class members were not undercompensated by what they were paid by the claims process. It did not matter that one could make the assessment that they were not undercompensated. The measure of the compromise, the measure of the damages, is what's alleged in the complaint so long as what's alleged in the complaint is non-frivolous. So, then the District Court engages in, how does the District Court then engage in an analysis to determine whether it's non-frivolous? It seems to me that the District Court needs to be E2C1 inquiry, right? Whether the amount of the money is fair relative to the strength of the claims, but when you're talking about windfall, the strength of the claims, you don't look at, well, what's the platonic result if we litigated this whole case and what the class members would get? Class members get windfalls all the time by that because defendants settle cases that they could have won, but they settle because of the risk of litigation. And maybe a platonically ideal judge would have adjudicated that as the class gets zero, but it's not a windfall that the parties settled. Here, Bank of America was willing to pay $39 million to resolve these regrets that now, but that doesn't make it a windfall. That doesn't mean that third parties get that money instead of the class. And there's a second element too, because we have the 97% of the class that received nothing, and they certainly have been undercompensated relative to the 2% of the class that made claims and direct distribution. Mr. Frank, what if the 2% to 3% got 100% return? What would your position be here to us today? If the 2% to 3% got 100% return, then under Bank of America, additional fees, sums to them would be a windfall. But you would still have the 97% of the class where direct distributions were feasible for at least some of those class members. And that's supported by rule 23E2C2, which fortifies Bank of America, that 2018 amendment, because that requires courts to evaluate the effectiveness of the distribution. And that's an objective standard. So the district court thus committed a second reversible error as a matter of law in holding further distributions to additional class members were not feasible. The question is whether every class member could be paid, that yes, class members who paid cash or didn't go to big box stores wouldn't get the same amount as class members who used credit cards and did go to big box member scores. But the question is whether some class members can be identified and paid with direct distributions. Counsel, this is Jed Smith. Was there evidence in the record about what the cost would be to pursue additional claimants? We presented evidence that this was done for a very low cost in cases with much smaller settlement funds. Specifically with reference to what it would cost to do it in this case. Was that in the record? The settling parties had the burden of showing that it was not feasible and they did not put that evidence into the record. Mr. Frank, are you referring to the argument about reaching out directly to the retailers for identification of purchasers? And I think there was some conversation in the hearing about the fact that a lot of these companies don't keep some of this information anymore for privacy reasons. Is that the conversation you're talking about that occurred at the hearing? Yes. And that's just simply falsified by the fact that other settlements do retrieve this information. Walmart has this information. Target has this information. Home Depot has this information. Several other retailers do too. And, you know, if class Ashmans can do this for small glyphosate products. Let me ask you a very pointed question. I thought that the record in the district court did not have detailed information about the availability of the very information you're talking about. Yes. And that's precisely our point. The settling parties failed to meet their burden that this was not feasible. They had the obligation to come forward and show something. I mean, you can't allege it's Martians going to come and get it or something like that, right? Well, we allege that other class actions do this with much smaller settlement funds and that there is no reason that it could not be done here. And they did not rebut that. I'm sorry. This is, as we say, a very honest question. But you're saying that we can find other cases. Did you point them out to us where they were able to go to these kind of big retailers that do a tremendous amount of this kind of business and get information? Yes, we did. We cited McCormick. We cited Pearson. We cited several other cases. That's in our briefing. Thank you. Thank you. Pearson was a much smaller settlement for a less popular product, but was still able to identify millions of class members. McCormick only involved three states. They were able to rule 23E1 on notice means that rule 23E2C2 is satisfied. As Virginia holds, different rule 23E clauses require different inquiries and are not mere surplusage. And direct distributions would not be duplicative of a claims process when over 97 percent of the class have not made claims. The district court just simply erred there. Even if the First Amendment problem of compelling class members to support speech, they would not agree with. I see that I'm running into my rebuttal time. I'll reserve the rest of my time for rebuttal. Well, Counselor, just one more question, and that has to do with where is the district court out of bounds in terms of the requirement of approval under rule 23? It's out of bounds under rule 23E2C2 and under Bank America, which holds that this sort of cypher is impermissible. Thank you, Your Honor. Thank you, Mr. Frank. Ms. Wicklund? Your Honor, I believe that the Attorney General was to argue at this point. Yes, Your Honor. Okay, let me get my cheat sheet out here and see if I've overlooked something. Pardon me, Your Honor. Okay, now who's arguing for the HE? Kathleen Smithcall for the state of Montana and the nine other amici states. All right, I see. Ms. Smithcall, please come to the podium. Great, thank you. May it please the Court. Like I said, my name is Kathleen Smithcall, and I represent the state of Montana and the nine other amici states in support of Ms. St. John. Attorneys General play an important role in the class action settlement process and protect consumers against agreements that are not fair, reasonable, or adequate. While district courts do retain significant discretion in approving these settlement agreements, they must follow rigorous standards when it comes to cypre distribution, and many have started to caution against the growing reliance on cypre distribution as a substitute for compensating class members directly. Council, are some of these given to Attorney Generals? Some of the cypre going to Attorney Generals? Your Honor, we are bringing this argument on behalf of the consumers who would be subject to the settlement agreement. No, no, mine's again a factual question. Missouri has several statutes, and the Attorney General gets funds for certain funds, gets part of settlements for certain funds. Trust me. Now, the question for you is, do some of these cypres go to Attorney Generals, their consumer funds, their Missouri protection funds, and their other funds? I think I see that, but tell me if that's true or false. I'm not sure, Your Honor, on behalf of all... Okay, thank you. Proceed, proceed. Thank you. As Mr. Frank argued, the proposed settlement fund here is $39.55 million, and of course, its purpose is to compensate the class members for the purported harm that they suffered, but this particular settlement agreement prioritizes the cypre distribution over compensating these class directly. Nearly 40% of the settlement goes to non-class member, third-party organizations, while as Mr. Frank said, somewhere between 97% and 98% of the class members receive nothing. Counsel, what if the court were to determine that notice was proper, that the Rule 23 requirements were met, what then? What if, in fact, all of the Rule 23 requirements are met, yet you're still left with a 40% leftover bucket of money? Then what is your position about the cypre? Your Honor, I would point the court's attention back to Bank America, because the threshold question is whether cypre is even appropriate. As the district court noted, there's effectively two options. The undistributed funds can either go to the participating class members as additional compensation, or it can go into the cypre. Let's assume that all of the T's have been crossed and the I's have been dotted in terms of trying to get it to the class members, and let's assume that any argument you have under Bank America has been resolved and has been met. Then what about a 40% to cypre? You've done everything you can and you still got 40%. What's your position on where that money can go? It should still go to the class members, because even if, under the American Law Institute 3.07 subsection A, that you have reached notice and reached out to all feasible class members, which the district court found here, then even so, the presumption still exists that that undistributed fund must go to the class members. The limitation of course... What about windfalls, counsel? We talked about windfalls. What about the windfall language? That is relevant particularly to liquidated damages. Well, counsel, does that really matter? We have two cases in, gosh, 97 and 02. Looks to me like we've clearly approved cypre when they were unliquidated. That's PAL and the airline ticket case. Are you familiar with either of our cases that appear to do that? Yes, your honor, but again, I would point the court to the Calajuri case, for example, and in that case, the district court approved a settlement agreement where the class members were eligible to receive $50 compensation as opposed to the $7 or $6 to $17 that they paid in their product. The district court does not have to just adopt the expert opinions that 50% compensation is full compensation here. The district court must look beyond the four corners of the settlement agreement and consider the claims that were full compensation is reached. And again, the presumption is that the undistributed funds must go to the class members themselves, not these third-party uninjured organizations, who again are not party to this litigation. And I see my time is almost expired, so I'll simply conclude by asking this court to reverse the district court's approval of the settlement agreement. Thank you, your honors. Thank you, Ms. Smith-Gall, and please accept my apologies for being late. Ms. Wicklund. Thank you, your honor. Now it's my turn. Petra Renee Wicklund, may it please the court, on behalf of the Plaintiff Eppley class. So we can't deny that Rule 23E5 grants the Center for Class Action Fairness, acting through its president, the right to bring these arguments on objection. But I would point out that in their zeal to disincentivize class action work, they're bringing arguments that have been used elsewhere and aren't particularly germane to what happened in this case or germane to Chief Judge Phillips' decision. It's very clear that the court understands the ALI factors from its previous questions. And I think if we look at the ALI factors, the 2010 ALI factors as adopted in Bank America, it's pretty clear that they are in fact met here, and that Chief Judge Phillips, far from holding that Bank America didn't apply, as the objector argued, went through those factors quite carefully. So the third factor is, of course, that the Cypre recipient's interest must reasonably approximate those being pursued by the class. But that was not raised in district court, and it's not raised here, so we can assume that's met. So the first of the three ALI factors is that where the class members can be identified through reasonable effort, you must make distributions directly to them. That did happen here. And in response to your honor's question, there was no evidence on record of the cost of going further, but we did have evidence on record of the administrator testifying that we had already used a targeted internet search history that was more likely to identify consumers than what was being speculated by the objector in terms of things that had reportedly happened in other cases. Counsel, please respond to the other point, which was that there are other cases where this has been done and those cases were called to the district court. Absolutely, the district court did address those cases in her footnote explaining why she thought that that would not work here and the fact that through the targeted internet search, we had already achieved 82 percent reach of class members at an average frequency of more than 2.5 impressions. Therefore, if class members had not made claims, it's more likely that they simply didn't want to make claims, and we were unlikely to get more from third-party subpoenas holding up the settlement than we had already got through the targeted internet search of the administrator. Counsel, is there some number, the number here in this case is just above 80 percent, is there some number in this area of litigation that's considered kind of sufficient to have to demonstrate adequate efforts to reach class members with notice? I would think that that number would vary a lot based on the type of claim. If you're talking about something like an athletic club where all the records are held by the defendant, it's going to be pretty easy to get 100 percent or near 100 percent. This is a consumer package good case where the products were largely not bought online but through retailers, making it much more difficult. In the motion for preliminary approval, the administrator had hoped to hit 80 percent. That was in fact in the second round of notice exceeded at 82 percent with average 2.5 impressions. What went into the determination of the entities that would become the benefactors of CyPray? I understand it's part of the negotiated settlement, but what went into identifying those? It was a list put forth and then debate and certain ones weeded out, others added. How did that process work? I would say that there was some debate. I think we ended up with two originally suggested by the defendant. The National Consumer Law Center and the National Advertising Division of the Better Business Bureau. And then when it was suggested by the court that perhaps we look into a third, the Center for Consumer Law and Economic Justice was added. All of these organizations deal with litigation for consumers as well as providing, I think, direct advice to consumers in this situation. So they were thought to approximate the interests of those who had not filed claims. Does the process permit others, like the appellants in this case, who may have interests, or the amici in this case, to petition or to have some input in the process of the election? There have been other cases, Your Honor, where organizations petitioned to be included in that process or to be included as CyPray. We did not have any such petitions in this case. So, moving on... Would other organizations have received any kind of... Oh, excuse me, Judge Kelly, go ahead. No, go right ahead. Anyway, hey, would other organizations even know about this? The settlement was publicly announced quite prominently. And so I would hope that... Well, how publicly? Was it shouted from the courthouse steps, you know, and walked away? I didn't mean how publicly. Help me. If I can recall, I believe there were cable television notices, there were radio notices in English and in Spanish. It was publicized in certain online publications such as Good Housekeeping, Golf Digest, et cetera, as well as on... And that's in the record, correct? What is in the record? Percy, and maybe Judge Kelly. Please. I have a question that goes back a step to the notice issue and what the customer, consumer needs to do once they see notice. In other words, was there any discussion in reference to these other cases, the McCormick case, the Pearson case, where there's more of a issue of notice? Do people know about this? And you've represented that this is a pretty high number, 82% for these kinds of cases. But then the next step seems to me to be once the consumer gets notice, do they have to fill out this whole claim process for $7 or $12? Or is there a way where they can just be reimbursed directly once they're identified? Is that something that was very easy to do in something where the defendant held the records and could identify and even give a credit to accounts or something like that? But it would be much more difficult in the consumer package good retail in-store purchasing to identify some number of consumers that are presumably in the class and may not have figured out or wanted to file a claim themselves and just send a random percentage money that way. I've not been able to see that done. Counsel, in some big tax refund cases, they give it to the middle people and require the middle people under penalty going to jail to get it back to the consumers. Was that explored in this circumstance? I think in tax refund cases, I hope if our system is working well, it's quite clear to whom those fees are due or those sums are due. No, counsel. Counsel, don't blow off the question. It's very serious. I'm sorry, I didn't understand. You give it to, no, you give it to, in this case, Walmart, okay? And you tell Walmart, here's this much money. We think it was from your people who bought from you. You can come back to us and account for it, and you get it to them. We had known evidence on record, Your Honor, that Walmart actually knows who bought Roundup from them. Well, okay, again, you're dodging the question. No, you didn't consider that, right, at any time in these classes? Never consider that kind of situation, correct? I was suggested by the objector to the district court who found it not feasible. Okay, good. Thank you. I did not know that. Thank you, Your Honor. In the issue of unfairness, I would just point out that the district court did make an independent determination that a windfall had essentially already been given. The district court spent two pages of an independent inquiry on what damages were available under the various states' laws and found that 50 percent of purchase price was well more than was the claimant's at trial. Therefore, we already had a windfall. What about the claim? I mean, even putting aside the question of whether you can just adopt whole cloth what's in the complaint, but here there is the allegation that I wouldn't have bought this at all had I been told proper, accurate information. Well, we do have to account for the fact that no one disputes that it worked as a weed killer. And so the claimants did receive the value of the weed killer. What we are saying is that this representation meant something to them and they did not receive the value of this representation, which is a different inquiry, Your Honor. And the district court did have access to the expert damages report that had been put together in the Blitz litigation and transferred by agreement to this case as well, which did not value the whole product but the whole case. And I cannot see the clock, but I believe my time is concluding at this point, so I will turn it over. All right. I don't see any questions. Thank you, Ms. Wicklund. Mr. Wilkerson? Actually, I believe Mr. Rosenthal is next, Your Honor. All right. Your Honor, I'm going to split my time. Well, not split my time. Mr. Wilkerson is going to take the First Amendment issue. I'm going to address the CyPrae. And so may it please the Court, John Rosenthal from Winston & Strawn for Monsanto. I think you're going to spend most of my argument here trying to answer some of the questions that the Court's already asked here. So I think we'll start out, first of all, with the idea of the windfall and what Bank America means. So what Bank America means in terms of is it limited to liquidated damages is not actually supported by the language of Bank America, nor is it supported by the case from which that language is taken, CLIER. What Bank America was doing was talking about in a situation where someone was fully compensated, whether or not they have a claim to what remains in the fund. And the proposition under CLIER here is you have to have an equitable claim in order to don't have access to those funds. Now, those funds are still the property of the class. And then the question on the ALI standard is what's the next best use. So here it's a question of compensation and your honors, Judge Kelly, you're abundantly right. And I believe that the states have conceded this. You don't look just to the complaint. That'd be preposterous because we have a notice pleading standard. And 80% of the time there is nothing other than the fact that damage is pled in a complaint. So you have to look at the course of the case, the damage experts and what is actually done during discovery in terms of what full compensation here. And that's exactly what the lower court did here, spent a lot of time evaluating the claims here. And in this case, there was expert testimony on both sides of the fence here. The plaintiffs put forward an expert that came between 7% and 15%. And we put forward an expert showing actual no damages. If you actually added or took out this statement from the product in terms of the conjoint work we did, there actually is no difference. In other words, there's no damages. At worst, our economists estimated damages would be at 2.8%. So what we ended up doing here was originally a 10% payment. And later, because of issues with respect to the amount of claimants, we engaged in a robust notice program where we not only did an original notice program, we did a supplemental program and then another program. As part of that, we also escalated the payments from the 10% to the 50% here to attract more claimants. That's three times. Mr. Rosenthal, under your theory then, is that a windfall? I mean, if the district court was going to approve something significantly less than 50%, it's sort of hard to estimate what a windfall then is in this particular situation. Your Honor, I think it's a great question. I would say it's bordering on a windfall, because we're at multiples here of what we believe the actual damages are in the case. See, I'm out of time. John, I believe they put three minutes on your clock, but it was supposed to be seven. Your Honors, should I proceed? I'll leave it up to counsel to divide your time. Yeah, I think I have three minutes left. Actually, four minutes left. In any case, Your Honor, it is bordering on that. I think at 50%, certainly over 50%, we are in the windfall area, and that's the ALI standard. That is, at what point does, and it's unfair, and courts have defined that, including Bank of America, at what point unfair becomes a windfall? I think we are certain it's bordering on that. Turning to the notice here, I would point out here the notice was extremely robust, $1.8 million, three different notice plans, including going out and buying a $200,000 list of emails of likely consumers and notifying them that way here. The court found— Counsel, let me interrupt you. Does the record reflect how many people you, Monsanto, sold an overwhelming percentage to? Like, did 90% go to a Walmart and two or three other big vendors? I don't believe there's a breakdown specifically, but the distinct majority of this volume goes to large box retailers, Your Honor. But I would— Sure. How many, when you say large box retailers, how many are there? I would say there are probably five to ten in the United States. Right. Okay. And they probably got an 80% or 90% range, don't you bet? I don't believe it's anything close to that height. So this is not even in the record, not even considered about the people that everybody knew about the whole time, right? Well, it was considered, Your Honor. In fact, Your Honor, this is almost identical to your case in the Pollard case. If you look at the notice plan here and what happened in the Pollard case, it's almost identical in terms of what we did in terms of print, media, direct mail, the one— Counsel, I'm trying to ask a basic question. Yes, Your Honor. Ms. Wicklund alluded to that perhaps it was in the record about how many of these big box people got an overwhelming percent of the sales of Roundup. Yeah, I believe in the sales. I don't believe they're broken down by a specific retailer. I would say the majority of the sales went to the big box— Counsel, the majority is 50%. I'm sure it's not 50%. So I take that as rather evasive, but it may not be in the record. Just tell me if it's not in the record. I do not know whether it was in the record. Okay, thank you. I can tell you that the court considered whether we should go to those retailers and the court— you want specific information from them. I thought that was the issue and not what percent of the sales went to them. That's correct, Your Honor, but in terms of— Okay, proceed. Go ahead. In terms of the notice provision, I would just note that the objector is not challenging the adequacy of the notice here, and the adequacy of the notice here for Cypre is no different than under Rule 23. There's no heightened burden here in terms of the adequacy of the notice, and if you look under the abuse of discretion standard, and that's where we are here, the district court specifically examined the adequacy of the notice here, considered whether or not, pursuant to the objector's request, we should be required to go to these big box retailers, and the district court said no. That was the district court's discretion, but the district court, consistent with Pollard, also said it's your objector— it's your burden to come forth with something other than just saying you should go as to why that that would be reasonable or cost-effective here, and in this instance, the court found that it would not. So, Your Honor, we recognize that Cypre is large here, larger than anybody would like, but the reality here is that Cypre is an accepted means within this circuit, and in fact, within every circuit, and while there's been criticism even at the Supreme Court, even the Supreme Court has endorsed the use of Cypre as an effective mechanism here to perpetuate a public policy of settlements. Here, the district court stringently applied the ALI standards, and we think the district court should be upheld. Thank you, Your Honor. Counsel, I have one follow-up question, if I could, Chief. Go ahead. Has there been consideration of making the claims process easier for the individual consumer? In other words, you've got great notice, let's say, and you've got 82 percent that have been notified about the possibility of getting this refund. Have claims administrators done any work that you know of to simplify that process? Nobody wants to fill out the refund form, right, and go through the claims process, and it seems to me that that might be an area where once you've got the notice, you could actually increase the distribution. So, Your Honor, we spent a great deal of time with the claims administrator, and we had the Rawa case as learning, and we spent a great deal of time trying to simplify it, including creating an electronic online system with the simplified claims. Part of the problem here, Your Honor, is the nature of these products here, particularly the larger packages. You could, under the terms of the settlement, actually get significant payments, and our experience in prior cases, including Rawa, which the court noted, is that there is the propensity of fraud here. So, we have to keep that in mind. There is a significant amount of fraud that goes on in this claimant process. Unfortunately, there are people that troll the internet and look for settlements, particularly where there's almost no or little burden to demonstrate a proof of purchase, and when we do a number of things with the claims administrator, that we're able to identify that fraud. So, we did simplify the process here through this electronic form process, but the idea that we should just put out there no proof of purchase and just send people money that allegedly we have some evidence they made a purchase, we find that that's not going to work in these kinds of consumer cases. Thank you, Mr. Rosenthal. Mr. Wilkerson? Thank you, Your Honors. Jeff Wilkerson, may it please the court. I'm going to talk very briefly about the First Amendment arguments in the time that I have. Appellant's arguments that the cypher aspect of the settlement is compelled speech violating the First Amendment has been rejected by court after court. It fails on two independent grounds, and frankly, it's not a close call. First, the settlement, including its cypher provisions, is a private agreement, so it cannot constitute a state action. Well, counsel, you know, we say in criminal cases, I know you're not a criminal lawyer, that a challenge by a defense attorney who's resisting the state at every point, a jury challenge is state action. So I have great trouble telling where the state action line is drawn. Well, the state action line is drawn, it was drawn 40 years ago in Bloom v. Uresky. Oh, counsel, now, of course, your time's up, so we won't pursue this. Do we have a case of this court on point on your First Amendment? What's our closest case? Your closest case on point is the Bloomberg case, Christina A. v. Bloomberg. That is not a state action case, but it does go directly to this point about private agreements and the nature of class action settlement. Thank you, Your Honor. Thank you. Thank you, Mr. Wilkerson. All right, Mr. Frank, your rebuttal. Thank you, Your Honor. The parties are trying to distract the court by talking about the adequacy of the notice under Rule 23E-1, and that's a completely different question about whether the distribution was effective under Rule 23E-2C-2. It's a different clause of 23E, and it's a different standard. It's not mere surplusage. Meeting 23E-1 doesn't mean that you've met E-2C-2, and we know the distribution was not effective here because it did not actually distribute the money to the class. And it's incredibly ironic that the defendants are complaining about the possibility of fraud in a claims process. If you want to get rid of any possibility of fraud, you go to the retailers, as we discuss at pages 30 to 33 of our opening brief, and again in our reply brief, you get the list of customers, and you directly mail them a check. And then you can even mail them a check for less than 50 percent and not even worry about the possibility of a windfall, because then you will get enough class members to distribute the entire fund. Does the record reflect the real cost of doing that the way you're doing it, or the way you're discussing it at this moment? I'm sorry, I did not hear that. Okay, I'll say it again because I fell over, too. Does the record reflect the real cost of trying to do that to get down to individual people who may have bought just a little bit of Roundup? Certainly. And we have in the record what it cost in other cases that were much smaller where it was feasible to do this. The parties did not try to rebut that with any evidence of their own. Okay, what's your best case, sir? What's your best case? McCormick, Pearson, all the cases we cite in pages 30 to 33. All of them. I was asking for the best case. McCormick, then, because... Okay, thank you very much. Which, where the subpoena was issued to make the distribution. Bayer is another good case on that. With respect to windfall, my friend's argument proves too much, because if it's possible to go to the court and say, well, if we litigated this out, the class wouldn't get this much. It's just as easy to go to the court and say, well, if we litigated this out, the defense would win. Even a peppercorn to the class is a windfall, and therefore everything should go to CyPray. And that can't be the answer. The previous cases where this court adopted CyPray, airline tickets, and so on, there were no Rule 23e challenges. Rule 23e2c2 did not exist. That was implemented in 2018. And everybody just accepted, okay, there's CyPray, and now we figure out where the CyPray goes. And nobody complained about it. Nobody complained that the settlement was unfair. Nobody asked for class members to get more money. So those aren't applicable here. And e2c2 says you looked at the effectiveness of the distribution, and if the parties choose a distribution that goes to third parties instead of the class members, they have flunked e2c2. And it doesn't matter if you've satisfied e1 if you flunk e2c2. Counsel, what authorities can we look to to determine at what point a district court abuses its discretion in making the conclusion that the distribution is equitable and fair? Well, here the court made a legal error about feasibility. It held it was not feasible because it would be duplicative. And how can it be duplicative? There are 97% of the class that got nothing. If you send them checks, that's not duplicative. The court held it's not feasible because then I can't determine the buyers who went to small stores. And that doesn't answer the question whether you can get some class members in, which is better than no class members. The feasibility question is a question of law. Yes, the court applied the wrong standard. It didn't hold that it was not feasible to do it. It held it was not feasible to notify everybody. And we agree it's not feasible to notify everybody. But this court holds you don't have to notify everybody. You don't have to pay everybody. It wasn't that everybody got paid in Bank America. It was a subset of class members who got paid in Bank America. So and Briseño versus Henderson is really on point on this. It wasn't a Cypre case, but it was the same thing where the settling parties only got $1 million to the class and said, but we tried really, really hard. We had all this notice. We made the claims process easy. We tried really hard to get the money to the class. And they just didn't want to take the money. And we satisfied E1B. And there's no obligation to do a direct distribution. And the Ninth Circuit said, you're right. There's no obligation to do a direct distribution. But E2C2 measures the effectiveness of the distribution. And you left money on the table. And you can't do that and get this such a disproportionate result. Now, disproportionality is less of an issue here, because it's $10 million versus $12 million versus $1 million. But there's still $16 million going to non-class members, going to third parties. And that is just wrong under Bank America. It's wrong under Baby Products. It's wrong under E2C2. And we asked the court to reverse settlement approval and send it back down, holding that the parties have to fulfill their obligations, their fiduciary duties to the class. Thank you, Mr. Frank. Thank you. Let me express my appreciation and thanks to all counsel who have appeared in our virtual forum this morning to provide argument and supplementation to the briefing that's been submitted in this case. This is a difficult issue and difficult factual record to get through. And we appreciate counsel's assistance in doing that argument. It has been helpful. It's a little clumsier on screen than in our courtroom. And but so we appreciate everyone's helpful participation this morning. Thank you. Counsel may be excused.